MARYLAND

## IN THE CIRCUIT COURT OF THE CITY OF BALTIMORE

|  |  |
|---|---|
| **VADIM A. MEDISH**<br>**5037 Eskridge Terrace, N.W.**<br>**Washington, D.C. 20016** | : <br> : <br> : |
| and | : |
| **MARK C. MEDISH, Individually and as**<br>**Parent and Legal Guardian of Vadim A.**<br>**Medish**<br>**5037 Eskridge Terrace, N.W.**<br>**Washington, D.C. 20016** | : <br> : <br> : |
| and | : |
| **SUE EDWARDS, Individually and as**<br>**Parent of Vadim A. Medish**<br>**5037 Eskridge Terrace, N.W.**<br>**Washington, D.C. 20016** | : <br> : |
| **Plaintiffs,** | : Case No.: 24 C17002945 |
| v. | : |
| **THE JOHNS HOPKINS HEALTH**<br>**SYSTEM CORPORATION T/A JOHNS**<br>**HOPKINS MEDICINE AND**<br>**THE JOHNS HOPKINS HOSPITAL T/A**<br>**THE JOHNS HOPKINS HOSPITAL,**<br>**INC.,** | : <br> : <br> : <br> : |
| and | : |
| **THE JOHNS HOPKINS HOSPITAL**<br>**600 North Wolfe Street**<br>**Baltimore, Maryland  21205** | : <br> : |

Regan Zambri Long
1919 M Street, NW
Suite 350
Washington, D.C. 20036

202-463-3030

Serve:  Joanne E. Pollack, Esq.                    :
        Administration 414
        600 North Wolfe Street            :
        Baltimore, Maryland  21205

                                    :

and

                                    :

SUBASH CHANDRA, M.D.
600 North Wolfe Street                               :
Baltimore, Maryland 21205

                                    :

        Defendants.                              :

## COMPLAINT FOR DAMAGES
(Medical Negligence)

## JURISDICTION AND VENUE

1.      Jurisdiction in this court arises under the State of Maryland Court and Judicial Proceedings Article §6-103, et seq.

2.      Venue in this Court is appropriate since the negligent acts and/or omissions complained of occurred in Baltimore, Maryland.

3.      Plaintiffs filed their original claim with the Health Care Alternative Dispute Resolution Office of the State of Maryland on April 19, 2016.

4.      On March 29, 2017, Plaintiffs filed a Waiver of Arbitration and accompanying Certificate and Report of Meritorious Claim from their qualified expert.

5.      On March 29, 2017, Harry L. Chase, Director, Health Care Alternative Dispute Resolution Office, issued an Order of Transfer.

6.     Accordingly, Plaintiffs have complied with the applicable requirements of Maryland law pertaining to the filing of medical negligence claims.

## PARTIES

7.     At all times relevant hereto, Plaintiff Vadim A. Medish was and is an adult citizen and resident of the District of Columbia.

8.     At all times relevant hereto, Plaintiff Mark C. Medish was and is an adult citizen and resident of the District of Columbia and the parent and legal guardian of Vadim A. Medish, pursuant to the July 28, 2015 Order of the Superior Court of the District of Columbia, Probate Division.

9.     At all times relevant hereto, Plaintiff Sue Edwards was and is an adult citizen and resident of the District of Columbia and the parent of Vadim A. Medish.

10.     Defendants The Johns Hopkins Health System Corporation t/a Johns Hopkins Medicine, The Johns Hopkins Hospital t/a The Johns Hopkins Hospital, Inc. and The Johns Hopkins Hospital are collectively referred to herein as "JHH Defendant" or "JHH."

11.     Upon information and belief, at all times relevant hereto, JHH Defendant was and is a medical facility licensed to do business in and conducting business in the State of Maryland.

12.     Upon information and belief, at all times relevant hereto, Defendant Subash Chandra, M.D. was and is a physician licensed to practice medicine in the State of Maryland.

- 3 -

13.     Upon further information and belief, at all relevant times herein, Dr. Chandra held herself out to Plaintiffs and to the general public as a professional who took all the necessary care and precaution in the practice of her profession and who was qualified to administer to her patients based on their medical needs with all necessary care and precaution expected of other physicians in his field.

14.     Upon further information and belief, at all relevant times herein, Dr. Chandra was an agent, servant and/or employee of JHH Defendant.

15.     Upon further information and belief, at all times relevant hereto, each of Ellen Mahar Mowry, M.D., Olga Fermo, M.D., Vinay Chaudry, M.D., Defendant Dr. Chandra, Yuval Patel, M.D., Jessica Lea Klein, M.D., David M. Cromwell, M.D., Katherine Wu, M.D., Scott Newsome, M.D., Sandeep Bansal, M.D., Christa Whelan Habela, M.D., Sara Hardy, M.D., Jessica M. Reardon, D.O., Benjamin James Barnes, M.D. and other agents, servants and/or employees of JHH Defendant who provided care and treatment to Plaintiff Vadim A. Medish (collectively, all named and unnamed health care providers are referred to herein as the "JHH Providers") were and are health care providers licensed to practice their respective areas of specialty in the State of Maryland.

16.     Upon further information and belief, at all times relevant hereto, the JHH Providers who provided care and treatment to Plaintiff Vadim A. Medish were acting as agents, servants and/or employees of JHH when they provided medical care and treatment to Plaintiff Vadim A. Medish, and JHH is vicariously liable for all acts and/or omissions thereof.

- 4 -

17.     Upon further information and belief, at all times relevant hereto, the negligent acts and/or omissions committed by the JHH Providers occurred in the State of Maryland.

18.     Upon further information and belief, at all times relevant hereto, the JHH Providers held themselves out to Plaintiffs and to the general public as professionals who took all the necessary care and precaution in the practice of their respective areas of specialty and who were qualified to administer to their respective patients based on their medical needs with all necessary care and precaution expected of other health care providers in their respective fields.

19.     Upon further information and belief, JHH is vicariously liable for all acts and/or omissions of the JHH Providers who provided care and treatment to Plaintiff Vadim A. Medish on the basis of apparent authority insofar as JHH led Plaintiffs to believe that said JHH Providers were agents of JHH, and Plaintiffs reasonably relied upon said agency.

## FACTS

20.     Upon information and belief, while in his second year of college in Boston, Massachusetts, Plaintiff Vadim A. Medish enjoyed his usual state of good health until October 2012, when he began to experience severe fatigue of unknown etiology.

21.     Upon further information and belief, in the months that followed, Vadim's fatigue became progressive, and he began to experience altered mental status and associated neurologic deficits.  He was evaluated by various health care providers and

- 5 -

was ultimately admitted to Boston Children's Hospital for altered mental status, among other things, where chest CT revealed a mediastinal tumor, later determined to be a seminoma, which was excised on April 3, 2013.

22.     Upon further information and belief, Vadim remained at Boston Children's Hospital until April 21, 2013, when he was transferred to JHH with admission diagnoses that included anti-Ma2 paraneoplastic encephalitis secondary to mediastinal seminoma. At the time of admission, JHH Providers formulated a plan of care that included steroid therapy, intravenous immunoglobulin ("IVIG") therapy, Rituxan, anti-seizure medication, and other interventions.

23.     Upon further information and belief, in the initial days following admission, Vadim's neurologic status fluctuated with periods of alertness, lack of orientation or awareness, dysarthria and agitation, among other things.

24.     Upon further information and belief, on or about April 25, 2013, JHH Providers concluded that Vadim was improved neurologically relative to his condition two weeks prior and noted progressively improving interactions with others and that periods of alertness and dysarthria were related to his level of somnolence.

25.     Upon further information and belief, despite this improvement, on April 30, 2013, Vadim suffered multiple generalized seizures; due to somnolence and declining oxygen saturation levels, he was emergently intubated without reported complication and transferred to the Critical Care Unit ("CCU").  JHH Providers determined that Vadim suffered status epilepticus related to encephalitis.

Electroencephalogram ("EEG") was indicative of the presence of diffuse cerebral disturbance and a focal left temporal epileptogenic zone.

26.     Upon further information and belief, Vadim's seizure activity resolved; he remained in the CCU, and, on May 1, 2013, he was extubated. Treatment with Cyclophosphamide, a cytotoxic medication, was initiated.

27.     Upon further information and belief, in the days that followed, Vadim's neurologic status showed improvement; however, reportedly due to somnolence and cognitive impairment, he sustained a near 10% weight loss from the time of admission.

28.     Upon further information and belief, on May 7, 2013, Vadim was viewed as neurologically stable and was transferred from the CCU to a medical-surgical floor.

29.     Upon further information and belief, in the days that followed, Vadim exhibited episodic alertness that facilitated meaningful interaction and conversation with JHH Providers and others despite a short attention span.  He began following commands with improved intelligibility, and brain imaging showed persistence of inflammatory activity within certain defined areas.  JHH Providers continued to manage episodes of hyponatremia and intermittent fever, and blood cultures revealed infection at the site of his PICC line.  Antibiotics were added to his treatment plan by JHH Providers.

30.     Upon further information and belief, Vadim continued to improve with normal motor function and resolved infection at the PICC line site, yet he continued to have episodes of intermittent tachycardia, fever and hyponatremia.

31.     Upon further information and belief, on or about May 18, 2013, JHH Providers considered a possible trial of IVIG treatment and a return to the CCU for monitoring during infusion; however, on May 21, 2013, IVIG infusions were started on the floor due to CCU bed unavailability with monitoring by JHH Providers.

32.     Upon further information and belief, the following day, Vadim was diagnosed with unintended weight loss related to his diagnosis of paraneoplastic encephalitis, alertness level, dysphagia, feeding assistance, and fluid status change. He continued to have extensive periods of somnolence and intermittent fever, thought to be related to hypothalamic inflammation. JHH Providers continued IVIG treatment and, due to somnolence, discontinued oral anti-epileptic medications and began intravenous medications.

33.     Upon further information and belief, on May 24, 2013, JHH Providers concluded that Vadim had become too lethargic to eat and therefore recommended nasoduodenal tube ("NDT") placement for feeding. The NDT was placed that same day. EEG performed on this date revealed bilateral increased slowed activity/bihemishperic discharge.

34.     Upon further information and belief, on or about May 26, 2013, JHH Providers determined that Vadim's NDT became kinked, necessitating removal. He was unable to take food or medicine by mouth with the exception of "critical" medications – sodium supplements and laxatives due to concern for possible bowel obstruction and/or constipation. On that same day, Vadim began to suffer episodes of desaturation that

- 8 -

improved with positioning and suctioning of oral secretions. Blood cultures were negative and chest x-ray was unremarkable, yet Vadim continued to have leukocytosis and intermittent increasing tachycardia and fever. He remained neurologically stable despite his somnolence of unknown etiology.

35.    Upon further information and belief, JHH Providers became increasingly concerned for bowel obstruction due to abdominal distention and reduced bowel sounds, among other things. A General Surgery consult noted a very low likelihood for bowel obstruction and recommended the addition of a bowel cleanse and bowel regimen to Vadim's treatment plan. A nasogastric tube was placed that same day.

36.    Upon further information and belief, on May 28, 2013, Vadim remained neurologically stable with an improved abdominal examination following implementation of General Surgery consult recommendations. His need for supplemental oxygen continued, and arterial blood gas testing ("ABG") results were noted to be consistent with hypoventilation. He remained unable to take food or fluid by mouth due to concern for aspiration, with secretions throughout his oral cavity.

37.    Upon further information and belief, in the days that followed, Vadim's need for supplemental oxygen persisted, and brain imaging revealed stable findings. JHH Providers concluded that, from a clinical standpoint, Vadim had been stable for the previous seven to 10 days. He continued to experience intermittent fever, leukocytosis, tachycardia, and increased tracheal secretions believed to be due to hypothalamic

inflammation. PET Scan ordered by JHH Providers revealed no metabolic evidence of residual malignancy.

38.     Upon further information and belief, on June 1, 2013, JHH Providers noted an acute change in Vadim's mental status, increased somnolence and increased need for supplemental oxygenation due to hypoventilation secondary to lethargy as evidenced by ABGs and considered transfer to CCU.

39.     Upon further information and belief, in the days that followed, EEG showed improvement since the previous study, and a percutaneous endoscopic gastrostomy ("PEG") tube was placed, allowing nutrition, fluids and/or medications to be delivered directly into his stomach. Brain imaging revealed stable findings, and Vadim enjoyed episodes of increased interaction with JHH Providers and family, at times smiling appropriately. JHH Providers administered Vadim's second course of Cyclophosphamide.

40.     Upon further information and belief, on or about June 7, 2013, JHH Providers began planning for rehabilitation despite the fact that Vadim was becoming increasingly somnolent with diminishing episodes of meaningful interaction with JHH Providers and family. Vadim also remained persistently tachycardic and continued to generate tracheal secretions with JHH Providers ordering suctioning every six hours as needed. Vadim's overall decline persisted, and, on or about June 14, 2013, Vadim desaturated to 89% while on room air and was found to be dyspneic with reduced

respiratory effort. He was placed on supplemental oxygen which improved his oxygen saturation level. Chest x-ray was unremarkable.

41.     Upon further information and belief, on June 15, 2013 and into the morning hours of June 16, 2013, Vadim was febrile, tachycardic, and hypotensive with electrocardiogram yielding abnormal findings. His secretions and requirements for supplemental oxygenation increased, at times reaching 6 liters per minute and requiring bagging. His respiratory effort was noted by JHH Providers as very weak, and lung sounds in the left hemithorax region were diminished. ABGs drawn on June 16, 2013 revealed hypercapnic respiratory failure, consistent with results from May 28, 2013. JHH Providers noted that Vadim was likely in hypothalamic autonomic storm during which time he was severely tachycardic, dyspneic, hypoxic, hypercapnic and less responsive.

42.     Upon further information and belief, during the evening hours of June 16, 2013, JHH Providers deemed it necessary to transfer Vadim to the CCU due to hypercapnia in the setting of hypoventilation and decreased responsiveness. He was admitted to the CCU at approximately 7:30 p.m. with a plan for intubation for hypercapnic respiratory failure.

43.     Upon further information and belief, in preparation for intubation, JHH Providers administered propofol and succinylcholine, following which Vadim became severely hypotensive and developed ventricular tachycardia followed by undetectable

- 11 -

pulse. Cardiopulmonary resuscitation began at 9:40 p.m., and spontaneous cardiac rhythm was restored 12 minutes later at 9:52 p.m.

44. Upon further information and belief, following Vadim's arrest on June 16, 2013, JHH Providers conducted various diagnostic testing in order to identify the cause of Vadim's cardiac arrest, including cardiac disease, pulmonary embolism and metastatic disease process, among other things. EEG revealed diffuse cerebral disturbance, and Vadim remained unresponsive and intubated in the CCU, having sustained significant deterioration per JHH Providers.

45. Upon further information and belief, in the weeks following his cardiac arrest, Vadim remained intubated and unresponsive, with progressive weight loss, and suffered countless complications, including pneumonia and infection with clostridium difficile. JHH Providers determined that further therapy directed at paraneoplastic inflammatory process was not indicated due to Vadim's compromised condition.

46. Upon further information and belief, Vadim was discharged from JHH on September 13, 2013. At the time of discharge, Vadim remained in critical condition. He was transferred to Children's National Medical Center, where he remained until May 2014.

47. Upon further information and belief, since the time of his June 16, 2013 arrest, Vadim has remained ventilator-dependent and has endured multiple hospital admissions, recurrent pneumonia, tracheitis and clostridium difficile and other infectious processes, malnutrition, electrolyte abnormalities, dysautonomia and anemia, among

other things. Vadim has suffered catastrophic neurologic and cognitive injuries and remains completely dependent on others for all activities of daily living and requires continuous care.

48.     Upon further information and belief, from the time of admission at JHH through the time prior to his cardiac arrest on June 16, 2013, Vadim's overall clinical condition, brain imaging and other studies had revealed some measure of improvement; accordingly, JHH Providers entered early planning stages for rehabilitation pending continued neurologic and cognitive recovery.  As a result of his cardiac arrest on June 16, 2013 and prolonged anoxia, Vadim sustained severe and debilitating brain damage and its sequelae, some or all of which is irreversible and permanent in nature.

**COUNT I**
**(Medical Negligence)**

49.     Plaintiffs incorporate, by reference, paragraphs 1 through 48 above, and further allege that, at all times relevant to the allegations herein, Plaintiff Vadim A. Medish had a health care provider-patient relationship with each of the Defendants and the JHH Providers, including without limitation, Dr. Mowry, Dr. Fermo, Dr. Chaudry, Defendant Dr. Chandra, Dr. Patel, Dr. Klein, Dr. Cromwell, Dr. Wu, Dr. Newsome, Dr. Bansal, Dr. Whelan Habela, Dr. Hardy, Dr. Reardon, Dr. Barnes and other agents, servants and/or employees of JHH Defendant who provided care and treatment to Plaintiff Vadim A. Medish.  Accordingly, Plaintiffs allege that each of the Defendants and the JHH Providers had a duty to provide Plaintiff Vadim A. Medish with medical

and/or other care and treatment consistent with the applicable national standard of care under the same or similar circumstances.

50.    Plaintiffs further allege that the Defendants and the JHH Providers identified above violated the national standard of care as practiced by reasonably competent health care providers under the same or similar circumstances, and, as a result, Plaintiff Vadim A. Medish suffered permanent and extensive physical, cognitive and emotional injuries and other damages.  The negligent care and/or treatment by the Defendants and the JHH Providers, included, but was not limited to, the following:  (a) the failure to perform and correctly interpret the necessary diagnostic and other studies and the related failure to formulate an effective and appropriate treatment plan given Vadim A. Medish's clinical presentation on April 21, 2013 and thereafter; (b) the failure to recognize and appreciate that Vadim A. Medish suffered respiratory failure beginning on May 28, 2013 and thereafter, including the failure to recognize and appropriately interpret the results of ABG testing as revealing hypercapnic respiratory failure; (c) the failure to promptly transfer Vadim A. Medish to the CCU or other intensive care unit beginning on May 28, 2013 and thereafter due to hypercapnic respiratory failure and for close monitoring and appropriate interventions, including intubation, judicious supplemental oxygenation and/or other respiratory support; (d) the failure to recognize beginning on May 28, 2013 that Vadim A. Medish required judicious supplemental oxygenation due to hypercapnic respiratory failure; (e) the failure to recognize beginning on May 28, 2013 that Vadim A. Medish's deterioration/instability was not due to fever and tachycardia; (f)

- 14 -

the failure to intubate Vadim A. Medish in the early morning hours of June 16, 2013 due to the change in his clinical condition during the previous day and overnight events; (g) the failure to recognize and appreciate that treatment with clonidine and a beta-blocker was not appropriate in response to Vadim A. Medish's hypercapnic respiratory failure; (h) the failure to proceed with intubation on June 16, 2013 in a safe, prudent and effective manner so as to avoid cardiac arrest; (i) the failure to confirm proper initial and continued placement of Vadim A. Medish's PEG tube, particularly in light of his progressive weight loss, clinical presentation and associated decline in clinical condition; and (j) the failure to otherwise act as reasonably competent health care providers under the circumstances.

51.    Plaintiffs further allege that, as a direct and proximate result of the negligent acts and/or omissions of the Defendants and the JHH Providers as aforesaid, Plaintiff Vadim A. Medish has suffered, continues to suffer, and will in the future suffer significant and severe physical pain and suffering, neurologic and cognitive damages, discomfort, mental anguish, loss of enjoyment of life, and other damages.

52.    Plaintiffs further allege that the Defendants and the JHH Providers violated the applicable standard of care as practiced by reasonably competent practitioners under the same or similar circumstances as aforesaid, and, as a direct and proximate result of the violation of the applicable standard of care, Plaintiff Vadim A. Medish has incurred and will continue to incur significant medical expenses for his care and treatment and has incurred and will continue to incur significant lost wages as a result.

53.    Venue is appropriate in Baltimore City, Maryland.

WHEREFORE, Plaintiffs demand judgment in an amount that exceeds $75,000 plus interest and costs.

### JURY TRIAL DEMAND

Plaintiffs, through counsel, respectfully request a trial by jury on all of the above claims.

Respectfully submitted,

REGAN ZAMBRI & LONG, PLLC

By: _____
Patrick M. Regan
pregan@reganfirm.com
Jacqueline T. Colclough
jcolclough@reganfirm.com
1919 M Street, N.W., Suite 350
Washington, D.C.  20036-3521
(202) 463-3030
(202) 463-0667 (Fax)
*Counsel for Plaintiffs*

- 16 -